Filed 7/25/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| COUNTY OF SAN MATEO,<br><br>    Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF SAN MATEO COUNTY,<br><br>    Respondent;<br><br>ZACHARY ROWE et al.,<br><br>    Real Parties in Interest. | A146077<br><br>(San Mateo County<br>Super. Ct. No. CIV 515962) |

A 72-foot diseased tree fell on a sleeping child's tent pitched in a campground that is located within a vast public wilderness park. The park's owner, the County of San Mateo, contends it is immune as a matter of law for this allegedly dangerous condition of its property under Government Code section 831.2, commonly referred to as the "natural condition immunity." It states: "Neither a public entity nor a public employee is liable for an injury caused by a natural condition of any unimproved public property, including but not limited to any natural condition of any lake, stream, bay, river or beach."[1] (See § 831.2.)

The trial court denied the County's motion for summary judgment under section 831.2, and we now deny the County's petition for a writ of mandate seeking to overturn

---

[1] All further statutory references are to the Government Code unless otherwise indicated.

the summary judgment ruling. We conclude there are triable issues of fact as to whether the property here was "unimproved."[2]

## BACKGROUND

On July 25, 2012, Zachary Rowe and his family were camping in San Mateo County Memorial Park, where they occupied campsite D-1 of Sequoia Flat Campground. Twenty feet from Zachary's tent stood a 72-foot, diseased tanoak tree suffering from a species of fungus called *Armillaria* that caused it to fail. In the early morning hours, while Zachary was sleeping, the massive tree fell on Zachary's tent, crushing him and inflicting catastrophic injuries. The tree also crushed a nearby picnic table. It came to rest on a bumper log located within campsite D-1, 42 feet from the tree's broken end.

San Mateo County Memorial Park is property owned by San Mateo County, consisting of approximately 499 wooded acres, with trails. Its campsites are located in a heavily wooded campground area, portions of which were cleared of trees. The campground area contains dozens of campsites as well as amenities such as paved roads, telephones, restrooms (with electricity, sinks and flush toilets), showers, dedicated parking areas, a dumping station and a store. An official campground map depicting the campground's layout and some of its amenities is reproduced in the appendix to this opinion as Figure 1.

Zachary's campsite consisted of a clearing with two picnic tables, a fire pit and a metal food locker. His tent was approximately 20 feet from the broken edge of the tree. A power line runs along an adjacent road and is visible from where the tree stood.

The tree was 20 feet away from a paved access road and surrounded by a cluster of five campsites, including Zachary's. A professional land surveyor determined there were 34 man-made improvements within 126 feet of where the tree stood, including roadways, bumper logs (which are large trees laid on the ground to keep cars out of camping areas),

---

[2] This case arises from the same incident as *Pacific Gas & Electric Co. v. Superior Court* (2017) 10 Cal.App.5th 563, in which we addressed a co-defendant's claim of recreational use immunity under Civil Code section 846. That statute is not at issue here.

2

restrooms, picnic tables, bear boxes, fire pits/barbeque pits, road signs, conductor poles with transformers and a parking bollard. According to the survey map he prepared, which is reproduced as Figure 2 in the appendix to this opinion, the man-made objects closest to the tree were a picnic table and a fire pit in a neighboring campsite, both some 13 feet away from the tree. The map depicts many man-made objects within the tree's 72-foot striking distance, including a power line within 37 feet at its closest point; two access roads, one of which was 22 feet away at its closest point and the other 61 feet away; and various amenities located in Zachary's campsite and several neighboring ones.[3] Also close by, but not within the tree's 72-foot striking distance, were two restrooms, one 113 feet away from the tree, and the other 126 feet away.

Since at least 1993, the County has inspected what it considers to be "developed areas" of the park for hazardous trees and removed them. It considered Sequoia Flat Campground to be a developed area.

*The Pleadings*

Zachary, by and through his guardian ad litem, sued the County for premises liability (§ 815.2) and dangerous condition of public property (§ 835). He alleged the tree had identifiable structural defects, including rot, a cavity and a denuded trunk and "was overextended, tilted and had poor taper." He alleged the County negligently failed to maintain campsite D-1 and its environs, failed to warn of or protect against the danger of falling trees, failed to inspect, care for, treat or trim the trees, and knew or should have known that the tree that fell was infected and posed a severe risk of injury yet failed to remove it.

Zachary also alleged, "[c]ampsite D-1 is one of many campsites located in a designated campground area of San Mateo Memorial State Park. These campsites were

---

[3] Aside from Zachary's tent itself, those objects were the amenities in neighboring campsite C-33 (bumper logs, two picnic tables, and a fire pit); the fire pit, bear box, and picnic table in Zachary's campsite (all within 61 feet to 70 feet of the tree); two bumper logs and a bear box in neighboring campsite D-10; and two picnic tables and a fire pit in another neighboring campsite (within 50 and 67 feet away, in campsite C-31).

created by the defendants who selected the location, created the design, cleared the vegetation in designated areas of the park, and improved the areas with picnic tables, barbeque grills, bathrooms and showers and otherwise improved these sites to accommodate high use, multi-day tent camping by the public."

*The Summary Judgment Motion*

The County moved for summary judgment on the ground that it was immune as a matter of law under section 831.2. It argued, first, that the tree that injured Zachary was a natural condition. It then rebutted several arguments it anticipated from Zachary as to whether the property was unimproved. The County contended, first, that the presence of bathrooms, showers and other amenities located elsewhere in the park other than at campsite D-1, as alleged in the complaint, did not vitiate its immunity. It also contended that Zachary "cannot argue that Section 831.2 immunity does not apply . . . by arguing that he was injured in a campsite 'improved' for campers . . . because the cause of his injury was the tree, a natural condition of the land." Finally, the County argued there was no evidence that its creation of campsite D-1 contributed to the accident. In support, it relied on the declaration of a certified arborist, Barnard Noonan, who had inspected the tree, the campsite and the surrounding area and opined that, "[t]he base of the tree was adjacent to the campsite. I saw nothing at the campsite to suggest that any human activity had caused or contributed to the tree having fallen across the campsite." According to Noonan, "the tree was in a natural condition when it failed, and it failed as the result of a progression of infection by a naturally-occurring fungus."

In opposition, Zachary introduced evidence that, among other things, man-made changes during construction of the campgrounds made the tree more susceptible to developing *Armillaria*. Specifically, in the opinion of arborist Roy Leggitt, "the manmade developments in Memorial Park, and the Sequoia Flat Campgrounds created by development, urbanization, construction and intense camping uses more likely than not created conditions that directly led" to the tree's infection by *Armillaria* and ultimately to its failure. He averred that, "Site conditions favorable to the development of *Armillaria* were created at the time of construction of this campsite and nearby improvements over

4

the years." Among other things, "[c]onstruction activity changed the nature of the soil and the root environment" in the tree's vicinity, which included "removal of adjacent trees, removal of mulch to bare dirt, grading of the soil for the road, soil compaction beneath the road, parking areas nearby and within the campsite, and changes in drainage," as well as clearing soil of all organic material and compacting it in order to construct roadways, parking areas and campsites, and in his opinion "[t]hese construction activities have negatively impacted tree health through soil and root damage." And, according to Leggitt, "construction activities and ongoing uses" caused the roots to gradually die from oxygen starvation. In addition, he stated the extensive removal of trees created favorable conditions for *Armillaria* because it left behind dead stumps and roots that are hosts for the fungus.

Zachary also submitted the declaration of horticultural pathologist James Downer opining that, "the man-made changes to the area around Campsite D-1, including the cutting and paving of nearby roads; creation of campsites and vehicle parking areas, and visitor traffic around the campsite predisposed the failed tree to becoming infected with *Armillaria*," and "the physical changes made to the area substantially increased the likelihood that the subject tree would become infected and ultimately contributed to its failure." His opinion was based upon the fact that trees are more susceptible to the disease when, among other things, soils "have been compacted by the construction of nearby roads, foot traffic, vehicle parking or other means."

The trial court concluded there was a triable issue of fact as to whether the property is unimproved, and denied the County's motion. It ruled principally on the basis of evidence that, at the time of the accident, both Zachary and the tree that fell on him were located within campsite D-1, that campsite D-1 had been "improved" by a clearing, picnic tables, a fire pit, and bumper logs to indicate areas for parking cars, and that in the tree's immediate vicinity were two other, developed campsites and a paved roadway. The court also relied upon the experts' opinions that those "man-made changes altered the characteristics of property surrounding the tree and contributed to the tree's failure by making the tree more susceptible to *Armillaria*."

5

The County's petition for writ of mandate followed.

## DISCUSSION

Summary judgment must be granted if all the papers submitted below show there is no triable issue of any material fact, "that is, there is no issue requiring a trial as to any fact that is necessary under the pleadings, and ultimately, the law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843; Code Civ. Proc., § 437c, subd. (c).) In evaluating that question, we do not review the trial court's reasons for its summary judgment ruling but only its ruling—that is, "whether the judge reached the right *result . . .* whatever path he might have taken to get there, and we decide that question independently of the trial court." (*Carnes v. Superior Court* (2005) 126 Cal.App.4th 688, 694, fn. omitted; accord, *Ram's Gate Winery, LLC v. Roche* (2015) 235 Cal.App.4th 1071, 1079 [trial court's stated reasons for summary judgment ruling "are not binding on us because we review its ruling, not its rationale"].)

## I.

### *The Natural Condition Immunity: An Overview*

Section 831.2 is part of the Government Claims Act of 1963 (§ 810 et seq.), a comprehensive statutory scheme governing the liabilities and immunities of public entities and their employees. (*Alana M. v. State of California* (2016) 245 Cal.App.4th 1482, 1487 (*Alana M.*); *Milligan v. City of Laguna Beach* (1983) 34 Cal.3d 829, 831 (*Milligan*).) Its purpose is to encourage public use of unimproved government property by relieving government agencies from being "put to the expense of making the property safe, responding to tort actions, and paying damages." (*Milligan*, at p. 833; accord, *Delta Farms Reclamation District v. Superior Court* (1983) 33 Cal.3d 699, 1174 [purpose is to "open[] up public property for recreational use by making it financially safe to do so"]; see also *Alana M.*, at p. 1487.)

A legislative comment formally adopted by committees of the Senate and Assembly sheds light on the Legislature's goal. (*Milligan*, *supra*, 34 Cal.3d at pp. 831– 832.) It states: " 'This section [831.2] provides an absolute immunity from liability for injuries resulting from a natural condition of any unimproved public property. Thus, for

6

example, under this section and Section 831.4,[4] the State has an absolute immunity from liability for injuries resulting from natural conditions of a state park area *where the only improvements are recreational access roads (as defined in Section 831.4) and hiking, riding, fishing and hunting trails.* [¶] This section and Section 831.4 continue and extend an existing policy adopted by the Legislature in former Government Code Section 54002. It is desirable to permit the members of the public to use public property in its natural condition and to provide trails for hikers and riders and roads for campers into the primitive regions of the State. But the burden and expense of putting such property in safe condition and the expense of defending claims for injuries would probably cause many public entities to close such areas to public use. In view of the limited funds available for the acquisition and improvement of property for recreational purposes, it is not unreasonable to expect persons who voluntarily use unimproved public property in its natural condition to assume the risk of injuries arising therefrom as a part of the price to be paid for benefits received." (*Milligan*, *supra*, 34 Cal.3d at pp. 832–833, italics added.) The Supreme Court has directed courts to apply the natural condition immunity "in accordance with [this] expressed purpose and refuse to apply it when application would not further the expressed purpose.' " (*Id.* at p. 832.)

As this court has explained, the statute presents two fact questions: whether a condition is "natural" and whether the property is "unimproved" public property. (*Fuller v. State of California* (1975) 51 Cal.App.3d 926, 937 (*Fuller*).) Here, Zachary does not contend the accident was caused by a non-natural condition. Therefore, the only issue we address is whether the County demonstrated as a matter of law the accident was caused by a condition of "unimproved" public property. (§ 831.2.)

---

**4** Section 831.4 grants public entities a separate immunity for injuries caused by a condition of unpaved roads providing access to recreational areas such as fishing, hunting, camping, and hiking grounds, and for paved trails providing access to any unimproved property.

The statute does not define the phrase "unimproved public property," nor does it establish any standard for determining when public property ceases to be 'unimproved' as the result of development activity. (*Keyes v. Santa Clara Valley Water District* (1982) 128 Cal.App.3d 882, 887–888 (*Keyes*).) It is well-settled, however, that improvements in one portion of public property do not destroy governmental immunity for unimproved areas. (*Rendak v. State of California* (1971) 18 Cal.App.3d 286, 288 (*Rendak*).) This court and others have applied *Rendak*, and upheld immunity, in a variety of circumstances where the only amenities argued to constitute improvements have been located some distance from the accident scene. (See, e.g., *Fuller*, *supra*, 51 Cal.App.3d at pp. 934–935, 936–937 [narrow, rocky, point of land from which plaintiff dove into ocean held not improved as a matter of law despite lifeguard towers, restrooms and fire rings located on nearby beach; under *Rendak,* "the immunity granted by [section 831.2] is to be given a broad application"]; *Eben v. State of California* (1982) 130 Cal.App.3d 416, 423 (*Eben*) [area of lake where waterskiing accident occurred held not "improved" by placement of warning buoys "located in an area some distance from the accident scene"]; *Geffen v. County of Los Angeles* (1987) 197 Cal.App.3d 188, 194–195 [area of beach where diving accident occurred held unimproved, despite lifeguard building, lifeguard towers, parking lots, food concessions, a promenade, breakwater, pier, and signage located elsewhere on beach at unspecified location(s)].)

Beyond *Rendak*'s holding that section 831.2 applies to unimproved areas that are "separate, distinct and remote" from improved portions of public property (see *Rendak*, 16 Cal.App.3d at p. 289), however, there is tension in the case law concerning various issues bearing on whether property is "unimproved." Given the manner in which the parties have framed the legal question before us, we address and resolve only those issues that are necessary to our decision.

8

## II.

### *Location of Injury Versus Location of the Natural Condition*

One area where the cases have diverged is how courts are to specify the relevant area of property for purposes of assessing whether it is improved or unimproved. *Rendak*'s early progeny developed the rule that "some form of *physical change* in the condition of the property *at the location of the injury* is required." (*Eben*, *supra*, 130 Cal.App.3d at p. 421; see also, e.g., *Keyes*, *supra*, 128 Cal.App.3d at pp. 887–888; *Tessier v. City of Newport Beach* (1990) 219 Cal.App.3d 310, 315 (*Tessier*).)

The first case to part ways with that rule was *Meddock v. County of Yolo* (2013) 220 Cal.App.4th 170 (*Meddock*), which held a public entity immune from suit by a plaintiff who was injured when standing in an improved area of public property (the paved parking lot of a boat ramp) when a tree growing in a nearby area fell on him. The court in *Meddock* assumed, but did not decide, that the tree itself was located on unimproved property. (See *id*. at p. 177.) In that context, *Meddock* held it was irrelevant that the tree fell, and caused injury to the plaintiff, on the improved portion of the public property, principally because of the statute's causation requirement. It reasoned, "[t]he statutory immunity extends to 'an injury *caused* by a natural condition of any unimproved public property.' (§ 831.2, italics added.) The use of the term 'caused' is significant. [Citation.] Here, although the injury *occurred* on improved property, that is, the paved parking lot, it was *caused* by the trees, native flora located near—and perhaps superjacent to—the improved parking lot, but themselves on unimproved property." (*Ibid*., fn. omitted.) *Meddock* held that "the location of the occurrence is not material to the statute." (*Id*. at p. 179, italic omitted.) It concluded that because the plaintiff's injuries "were *caused by* decaying natural trees located on unimproved property," the county was immune. (*Id*. at p. 182.)

Relying in part on *Meddock* and distinguishing prior authorities, our colleagues in Division Three recently announced the rule that "[w]hen the location of the injury is *different* from the location of the natural condition, the character of the location of the injury is not relevant." (*Alana M.*, *supra*, 245 Cal.App.4th at p. 1489.) *Alana M*. found

9

textual support in the statute; it reasoned that "because the phrase 'of any unimproved public property' in section 831.2 modifies the 'natural condition' that caused the injury, the relevant issue for determining whether the immunity applies is the character (improved or unimproved) of the property at the location of the natural condition, not at the location of the injury." (*Ibid*.)

Applying these principles, *Alana M.* held a public entity immune from suit when a tree fell and injured a child sleeping in a tent in a state-owned campground. It held the tree was a natural condition of "unimproved" property as a matter of law, despite the fact it "fell on an improved campsite." (*Alana M.*, *supra*, 245 Cal.App.4th at p. 1491.) In part the court reasoned, "[t]here is no evidence of any artificial physical change in the condition of the tree . . . or of the land within 24 feet of the tree." (*Ibid*.) And the court held the fact the tree was tall enough to fall within the plaintiff's campsite "does not show the tree that fell was on improved property." (*Id*. at p. 1492.) Nor did evidence that the tree was subject to the state's tree hazard inspection program which, according to the state's operational manual, applied " 'solely within the developed areas' " of state parks; *Alana M.* held the defendant's "belief that the tree was on improved property is not competent evidence" but merely a legal conclusion.[5] (*Id*. at pp. 1486, 1493, italics omitted.)

In evaluating whether Zachary's injuries were caused by a "condition of unimproved property," our task in this case, as it was in *Meddock* and *Alana M.*, is somewhat complicated by the fact that the peril here—a falling tree—did not have a fixed location. In effect, it was a migratory danger; it began in one location but ended up, and caused injury, in another. The same was true in *Rendak*, the first reported opinion to construe the statute, which involved a landslide from a cliff high above a strip of beach that killed a visitor walking on the beach below. (See *Rendak*, *supra*, 18 Cal.App.3d at pp. 287–288.) However, in holding the state was immune as a matter of law, *Rendak*,

_____

[5] This aspect of *Alana M.* forecloses Zachary's argument that the County's tree inspection program has any bearing on whether the property here is improved.

unlike *Meddock* and *Alana M.*, did not consider the characteristics of the condition's location (i.e., the (obviously) unimproved cliff) but, rather, the characteristics of the beach some 72 feet below where the hazard struck.[6]

Nevertheless, we do not need to decide whether and to what extent the location of the condition, or the location of injury, controls when dealing with a transitory hazard because in this case, unlike in either *Meddock* or *Alana M.*, there is evidence from which a trier of fact could conclude the diseased tanoak tree was *not* in a different location than the site of the accident, and was growing in an improved area.[7]

First, unlike in *Alana M.*, there is evidence the trunk of the tree was growing within the boundary of Zachary's own campsite which, for the reasons discussed *post*, we conclude raises a triable issue of fact as to whether the campsite is unimproved.

---

[6] In its discussion of the relevant facts, for example, *Rendak* noted that "[a] rest room appears to be the nearest improvement *to the site of the fatal accident* here involved, and it is some 650—900 feet from the accident site." (*Rendak*, *supra*, 18 Cal.App.3d at p. 287, italics added.) The court also reasoned, among other things, that section 831.2 "specifically extends the immunity to 'any natural condition of any . . . beach' "—an obvious reference to the accident site, not the cliff above where the danger originated. (*Rendak*, at p. 288, italics omitted.)

*Alana M.* said that "[i]n *Rendak*, the dangerous condition and the area where the decedent died were generally the same location." (*Alana M.*, *supra*, 245 Cal.App.4th at p. 1490, citing *Rendak*, *supra*, 18 Cal.App.3d at pp. 287–289.) But the dangerous condition in *Rendak*, initially before it struck, was farther away from the accident victim than in *Alana M.* It was a 72-foot high cliff that collapsed into the sea on top of the victim. (See *Rendak*, *supra*, at pp. 287–288.) In *Alana M.*, by contrast, the tree that crashed onto the plaintiff's tent had been growing just 60 feet away from the campsite before it fell. (See *Alana M.*, at p. 1485.) This was four feet closer to the victim before it struck than the cliff that collapsed in *Rendak*.

[7] Another decision dealing with a transitory hazard, to which the County at oral argument likened this case, is *Arroyo v. State of California* (1995) 34 Cal.App.4th 755, which held that section 831.2 applied as a matter of law to a personal injury suit brought by a child who was mauled by a mountain lion while walking on a hiking trail in a state park. *Arroyo* is irrelevant, though, because the question whether the property was "unimproved" was not at issue. (See *id.* at pp. 760–761.) The court merely held the lion was a natural condition, notwithstanding various arguments to the contrary. (See *id.* at pp. 761–762, 764–765.)

Although the County disputed the tree's location, the incident report described the tree as "located in the north end of campsite D-1", and one of Zachary's experts, arborist Roy Leggitt, stated in a declaration it was "located within" that campsite. Furthermore, regardless of the trunk's location, Zachary also introduced evidence that the tree's roots would have been growing underneath the campsites: according to his expert Leggitt, "The root system for the 72-foot tall tanoak tree that failed, under normal conditions, would extend at least 50–60 feet out from the trunk of the tree in all directions. Thus, the root system under normal conditions would extend beneath Campsite D-1 and the adjacent campsites, the parking areas for nearby vehicles, and beneath the paved road adjacent to the tree." Obviously, a tree's roots are part of the tree; indeed, in this case the weakening of the roots, according to Leggitt, contributed to the tree's failure. According to Leggitt, the tree's roots deteriorated over time "as oxygen-starved roots have gradually died from construction activities and ongoing uses."

Second, the trunk of this tree was considerably closer to the improved accident site and surrounding amenities than was true in *Alana M*. Whereas in *Alana M*. the tree was growing 60 feet away from the injured victim's campsite (see *Alana M*., *supra*, 245 Cal.App.4th at p. 1485), the tree that fell on Zachary was roughly 20 feet from where his tent was pitched.[8] It also was only 13 feet away from the nearest manmade objects depicted in the surveyor's map (a picnic table and a fire pit), compared with 30 feet in *Alana M*. (a picnic table). (See *ibid*.)

And finally, unlike in *Alana M*., there also is evidence of physical alterations at the site where the tree grew. Zachary's expert James Downer opined that "[t]he soil around the stump of the failed tree . . . was bare, compacted and lacking litter in 2014 and thus likely low in recycled organic . . . nutrients." And according to arborist Leggitt, "[c]onstruction activity changed the nature of the soil and the root environment in the

_____

[8] The precise distance between the broken tree stump and Zachary's tent does not appear to be in the record. However, a map of measurements attached to the incident report depicts the stump in extremely close proximity to the broken end of the tree, which was itself 20 feet from the tent.

vicinity of the subject tree," and he explained at some length how the removal of mulch during campground construction, and the removal of trees "in the area immediately surrounding the subject tree" damaged the tree's health by impairing the level of nutrients in the soil and, ultimately, damaging the tree's roots. He also opined that the removal of other trees in the vicinity during campground construction created a clearing around this tree that caused it to grow asymmetrically toward sunlight, and made it susceptible to torsional loads from high winds.

In sum, there are triable issues of fact as to whether the tree was growing in the same general location as the accident site or, even if it was not, was itself growing in an improved area by virtue of the artificial physical changes in its immediate vicinity.

### III.

### *On This Record, There Are Triable Issues of Fact As to Whether the Campsite Area Where Zachary Was Injured Is "Unimproved" Property.*

This brings us, next, to whether the cluster of campsites where Zachary's was located is "unimproved" as a matter of law, as the County contends, or whether Zachary's evidence raises triable issues of fact concerning that issue. Given the above-discussed evidence indicating the tree was within Zachary's campsite, it is necessary for us to address this issue.

The County argues that the "primitive amenities" within the campground or the campsites themselves don't render the area improved. Citing *Mercer v. State of California* (1987) 197 Cal.App.3d 158, 165, it contends "[t]he Legislature could not have intended the immunity to be avoided by the presence of simple accoutrements like campsites with picnic tables, and access roads to get there," because the statute "should not be interpreted to 'thwart accessibility and enjoyment of public lands by discouraging the construction of such improvements as restrooms, fire rings, campsites . . . .' " However, the County has quoted a portion of *Mercer* out of context; *Mercer* assumes campsites *are* improvements. Addressing the *Rendak* principle that "improvements of a portion of a public park do not remove the immunity from the unimproved areas," *Mercer* explained: "The reasonableness of this rule is apparent. Otherwise, the

13

immunity as to an entire park area improved in any way would be demolished. [Citation.]  This would, in turn, seriously thwart accessibility and enjoyment of public lands by discouraging the construction of such improvements as restrooms, fire rings, camp sites, entrance gates, parking areas and maintenance buildings." (*Mercer*, at p. 165.)  In other words, *Mercer* was saying, if the construction of improvements such as restrooms and camp sites destroyed immunity *for an entire park*, then a public entity might be deterred from building those kinds of improvements in order to retain immunity for unimproved areas.  *Mercer* was not saying that immunity should apply to the areas where such amenities were constructed, in order to encourage their construction.

In that respect, *Mercer* does not stand alone.  The courts have generally understood campsites with amenities to be improved, including the court in *Alana M*. (See *Alana M.*, *supra*, 245 Cal.App.4th at pp.1485, 1491 [noting that tree fell "on an improved campsite" which consisted of a leveled area for tent, fire pit, picnic table with benches and small wooden foot locker]; *Meddock*, *supra*, 220 Cal.App.4th at p. 180 [" 'camping sites with stoves, running water, sanitary facilities, garbage service and organized recreational activities . . . would be excluded from the scope of this suggested immunity' "], italics omitted, quoting Van Alstyne, A Study Relating to Sovereign Immunity (Jan. 1963) 5 Cal. Law Revision Com. Rep. (1963) pp. 495–496).)

The County also argues the amenities here are "trivial," but we disagree.  Befitting a campground, they are of course modest.  But, based on this record, there can be no question that the area where this cluster of campsites is located has undergone significant artificial physical change, and is no longer in a natural state.  (Cf.  *Buchanan v. City of Newport Beach* (1975) 50 Cal.App.3d 221, 227 (*Buchanan* ) ["an improvement … does not necessarily mean the building of structures"].)  The nearby paved road is an improvement too, as reflected by the legislative committee comment we previously quoted which characterizes "recreational access roads" as improvements, yet notes those kinds of roads are protected by the separate immunity of section 831.4.  (*Milligan*, *supra*, 24 Cal.3d at pp. 832–833.)  None of the authorities cited by the County supports its characterization of these changes as "trivial."  For example, the County cites our decision

14

in *Fuller* where amenities such as fire pits and restrooms on a beach did not render a nearby rocky cliff "improved"; the reason, though, was not because of the nature of those amenities but, rather, their distance from the accident site. (See *Fuller*, *supra*, 51 Cal.App.3d at pp. 936–937.) The County also cites *Bartlett v. State of California* (1988) 199 Cal.App.3d 392, in which the court held that sand dunes on a portion of state beach used as a recreational area for all-terrain vehicles were not improved even though the state posted usage and speed limit signs nearby and provided some toilets at an unspecified location. (See *id.* at pp. 396, 398.) But the evidence Zachary introduced indicates that in Memorial Park the County did far more.

Zachary's evidence showed the County: artificially altered the terrain by removing nutrient-rich mulch down to bare dirt, and by installing a paved road, which caused soil to become compacted and increased water run-off there which often causes soil to become over-saturated; partially cleared the area of trees; and constructed rudimentary amenities to facilitate cooking, eating and overnight sleeping in the area where Zachary was injured and where the tree itself grew. This evidence raises triable issues of fact as to whether the campsite was unimproved within the meaning of the immunity statute.

Finally, the County argues that the policy implications of treating campsites as improved are untenable. "[I]f a simple campsite in a forested mountainside is 'improved' for purposes of Section 831.2," it contends, "then public owners of such property will be faced with the 'Hobson's choice' that the statute was enacted to avoid. To use Memorial Park as an example, the County would be forced to eliminate campsites, remove roads to access the interior of the park, and police hikers to assure they did not damage brush or natural mulch. The alternatives would be to risk potentially ruinous liability or close the parks altogether."

We do not agree. A ruling that the County has improved one portion of its vast public wilderness park by building improved campsites would not destroy immunity for unimproved portions of the park. (*Rendak*, *supra*, 18 Cal.App.3d at pp. 288–289.) The public would be free to use those areas, and would assume the risk of any dangers they

pose, exactly as the Legislature intended.  (See *Milligan*, *supra*, 34 Cal.3d at p. 833.)
And although the County theoretically might consider eliminating improvements such as
campsites rather than shoulder responsibility for keeping those improved areas safe, such
a choice would not undermine the statute's purpose.  Section 831.2's goal is to encourage
recreational use of *unimproved* public land (*Milligan*, at pp. 832–833), not to encourage
the construction of amenities and improvements on public property.  Nor would interior
access roads be imperiled; they are protected by the separate statutory immunity of
section 831.4.  In short, we do not think treating this cluster of campsites as "improved"
property for purposes of section 831.2 thwarts the Legislature's goals.

  In any event, we conclude that the evidence here raises triable issues of fact as to
whether the cluster of campsites where campsite D-1 is located is "unimproved"
property.

**IV.**

### There Are Triable Issues of Fact As to Whether Artificial Changes Contributed to the Tree's Dangerousness.

  The final issue the parties have raised, and another area in which the authorities
are somewhat in tension, is whether proof of a causal link between physical changes and
the accident is either necessary and/or sufficient for property to be considered
"improved."  Specifically, there is tension in the case law as to the legal significance of
evidence that artificial, physical changes to the environment have contributed to or
exacerbated a naturally occurring danger.  Broadly speaking, some authorities have held
such changes to be legally *insufficient* to defeat immunity (principally addressing the
issue in the context of what constitutes a "natural" condition) (see, e.g., *Goddard v.
Department of Fish and Wildlife* (2015) 243 Cal.App.4th 350, 361 ["section 831.2 has
been broadly construed to provide immunity even where a natural condition has been
affected in some manner by human activity or nearby improvements"]; *Knight v. City of
Capitola* (1992) 4 Cal.App.4th 918, 927–929 (*Knight*); *Tessier*, *supra*, 219 Cal.App.3d at
pp. 313–315; *Morin v. County of Los Angeles* (1989) 215 Cal.App.3d 184, 189–190
(*Morin*); *Fuller*, *supra*, 1 Cal.App.3d at pp. 937–938; cf. *Schooler v. State of California*

16

(2000) 85 Cal.App.4th 1004, 1009–1010 [construing § 831.25]); one has held them legally *sufficient* (see *Buchanan*, *supra*, 50 Cal.App.3d at pp. 225–228[9]); and most recently, our colleagues in Division Three in *Alana M.* held such proof legally *required*, as an additional element to be satisfied. According to *Alana M.*, "immunity applies unless an improvement or human conduct created, contributed to, or exacerbated the degree of, the danger associated with a natural condition." (*Alana M.*, *supra*, 245 Cal.App.4th at p. 1489.) Stated otherwise, *Alana M.* required proof of " 'a causal nexus between the dangerous condition and either human conduct or an artificial improvement.' "[10] (*Ibid.*)

It is unnecessary for us to examine these authorities at any length, or attempt to reconcile them. Here, although the County argues that "a public property owner is immune from liability for injury from natural conditions *regardless* of whether human agency has contributed to risks attendant on those conditions," and that the trial court erred in denying summary judgment because evidence that human activity accelerated the

---

[9] Later cases have limited *Buchanan* to its facts, but none have disagreed with it. (See *Knight*, *supra*, 4 Cal.App.4th at p. 929 ["an extreme case" involving "unusual facts"]; *Morin*, *supra*, 215 Cal.App.3d at pp. 189–190 [*Buchanan* involved improvements that "physically alter[ed] the accident site"]; see also *Tessier*, *supra*, 219 Cal.App.3d at pp. 314–315; *Geffen v. County of Los Angeles*, *supra*, 197 Cal.App.3d at p. 195, fn. 4; *Eben*, *supra*, 130 Cal.App.3d at p. 425 [distinguishing *Buchanan* where improvements "were few in number and remote from the accident site, which was unimproved" and there was no evidence "link[ing] the improvements, casually or otherwise, with the accident"]; see also *Mercer*, *supra*, 197 Cal.App.3d at p. 165 [*Buchanan* illustrates the principle "that to qualify public property as improved . . . the improvements must change the physical nature or characteristics of the property at the location of the injury to the extent that it can no longer be considered in a natural condition"].)

[10] Applying that principle, *Alana M.* concluded section 831.2 applied in that case, in part because there was no evidence that artificial improvements or human conduct contributed to the tree's danger in that case, such as evidence "that leveling the area of the campsites weakened the tree and made it more likely to fall." (*Alana M.*, *supra*, 245 Cal.App.4th at p. 1491.) *Alana M.* also held the required causal nexus could not be established by the fact the improved campsites would attract people to the area, and thus increase the likelihood someone would be injured by a falling tree. (See *id.* at pp. 1491–1492.)

17

effect of *Armillaria* infection was legally irrelevant, elsewhere in its briefing the County appears to concede that changes to the natural environment of public property that bear some causal connection to a plaintiff's injury *are* relevant to determining whether property remains "unimproved."[11]  And, indeed, that concession appears to be well-founded, for the policy of relieving public entities from the duty of making property in its natural state safe (see *Milligan*, *supra*, 24 Cal.3d at p. 833) is not furthered by relieving them, when they *do* choose to improve property, of liability for making natural hazards there more dangerous.  "Since the policy on which the immunity is based is not applicable . . . , the immunity should not be applicable."  (*Milligan*, *supra*, 24 Cal.3d at p. 833.)  A contrary interpretation would immunize a public park owner from liability for a tree that crashes onto a restroom, a park ranger's office or a visitor center, as long as the tree grew in undisturbed soil some distance away as in *Alana M.*, even if those construction activities undermined the integrity of the tree's root system.  Or from a rockslide that pummels a picnic or campground area, even if jackhammers or other heavy equipment used in the construction of roads and other amenities dangerously destabilized a nearby mountain slope.  We do not think conferring immunity in those instances would serve the Legislature's goal.[12]  (See *City of Santa Cruz v. Superior Court* (1988) 198 Cal.App.3d 999, 1006–1007 ["the Legislature intended to preclude liability for

---

[11]  The County argues, for example, "property is not 'improved' for purposes of Section 831.2 . . . unless the 'improvements' of which plaintiff complains caused the event leading to injury.  Changes to property that do not and cannot be considered to have caused the injury (picnic tables) have no relevance . . . ."  Likewise, it says "immunity is not avoided by changes to unimproved property absent a showing that those changes caused the accident."

[12]  We note that beaches and bodies of water may present a different calculus, because they are protected by section 831.2 without regard to their improved or unimproved status.  As explained in *Knight*, "[o]n its face the last clause of . . . section 831.2 provides public entities with immunity, without express reference to the improved or unimproved status of the property, for injuries caused by '*any* natural condition of *any* lake, stream, bay, river or beach.' "  (*Knight*, *supra*, 4 Cal.App.4th at p. 927, first italics added.)  The statute's wording "vitiate[s] the 'unimproved' requirement as applied to public streams, bays, rivers [citation], and beaches."  (*Id.* at p. 928; accord, *Morin*, *supra*, 215 Cal.App.3d at p. 189.)

unimproved natural conditions unless the public entity engaged in conduct which actively increased the degree of dangerousness of a natural condition"].)

We express no opinion, however, as to whether proof of a causal link is merely sufficient to defeat immunity or, as *Alana M*. held, necessary. Zachary contends proof of a causal connection between improvements and the accident is necessary to establish that property is improved and thus accepts the burden of having to prove this. Therefore, for purposes here, we will assume without deciding that proof that human conduct or improvements created, contributed to, or exacerbated the dangerousness of a natural condition is not only a sufficient but necessary, additional element of establishing that property is "improved." (See *Alana M*., *supra*, 245 Cal.App.4th at p. 1489.)

In this case, a trier of fact could conclude that man-made physical changes in the vicinity of the accident site contributed to the tree's dangerousness and thus were causally linked to its falling. Unlike in *Alana M*., Zachary introduced two expert declarations, those of Leggitt and Downer, that, as described above, detailed the negative impacts of construction activity on the tree's health that made the tree more susceptible to developing the *Armillaria* infection that ultimately caused it to fall.[13] For the first time in its reply brief, the County argues there is no foundation for those experts' statements about the historical facts concerning the construction activity that was undertaken when the campground was built. But, unlike in the authority the County cites (where the question was not even at issue on appeal) (see *City of Santa Cruz*, *supra*, 198 Cal.App.3d

---

[13] We limit our analysis to evidence of physical impacts that did not result exclusively from normal use of the campground for its intended recreational purpose. On this point, we agree with the County that mere public use of property cannot render it "improved" so as to defeat immunity, because otherwise the statute's purpose would be thwarted. (See *Alana M*., *supra*, 245 Cal.App.4th at pp. 1491–1492; cf. *Schooler v. State of California*, *supra*, 85 Cal.App.4th at pp. 1009–1011 [public entity held immune from liability for bluff erosion notwithstanding contributing impact from pedestrian traffic] [construing § 831.25].)

at pp. 1004), the County made no such objections below or in its opening brief to this court, and therefore has waived them.[14] (See Code Civ. Proc., § 437c, subd. (d).)

In short, in this case there is evidence that artificial improvements or human conduct "weakened the tree and made it more likely to fail." (See *Alana M*., *supra*, 245 Cal.App.4th at p. 1491.) Accordingly, every element of *Alana M.* was satisfied and the trial court properly denied summary judgment for the County.

At bottom, although the majority of courts before us have, on other facts, held section 831.2 applicable as a matter of law, this case, on this record, presents exactly the situation envisioned by the lead drafter of the Government Claims Act, Professor Arvo Van Alstyne. (See *Meddock*, *supra*, 220 Cal.App.4th at p. 179.) According to Professor Van Alstyne, "[t]he distinction between the 'developed' land and the 'undeveloped' sectors of a park might well be difficult to identify in terms of boundary lines on a map, and might have to be treated as a question of fact . . . ." (Van Alstyne, A Study Relating to Sovereign Immunity (Jan. 1963) 5 Cal. Law Revision Com. Rep. (1963) pp. 495–496.) The very first reported case to construe the statute contemplated that possibility too. (See *Rendak*, *supra*, 18 Cal.App.3d at pp. 288–289 [acknowledging there may be cases presenting a jury triable question of fact "as to whether the unimproved danger area is 'within and can be said to be a part of the improved area' and thus outside the immunity extended by section 831.2"].) This is such a case.

---

[14] At oral argument, the County asserted that it did object in the trial court to the experts' purported lack of foundation, but its briefing in this court does not cite anything in the record reflecting such an objection and we can find none. Zachary's counsel asserted at oral argument that there was no such objection, the register of actions does not show that the County filed any written objections to Zachary's evidence with its reply papers, and no such objection was made at the hearing.

## DISPOSITION

The petition for writ of mandate and/or prohibition is denied.  The stay of trial court proceedings this court entered on February 4, 2016, as between plaintiff Zachary Rowe and defendant County of San Mateo is hereby lifted.  This decision shall become final 30 days after its filing.

# APPENDIX

## Figure 1



**Figure 2**



_____
STEWART, J.

We concur.


_____
KLINE, P.J.


_____
RICHMAN, J.


*County of San Mateo v. Superior Court* (A146077)

Trial Court:   San Mateo County Superior Court

Trial Judge:   Hon. Steven L. Dylina

Counsel:

Ropers, Majeski, Kohn & Bentley, Susan H. Handelman, Dennis J. Ward, Terry Anastassiou for Defendant and Petitioner.

No appearance for Respondent.

Law Office of Gerald Clausen, Gerald Clausen; Rouda, Feder, Tietjen & McGuinn, Timothy G. Tietjen for Real Party in Interest.